IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ROCIO REYES,

                        Plaintiff,

vs.

PHARMA CHEMIE, INC., a
Nebraska Corporation,

                        Defendant.

8:11CV228

MEMORANDUM AND ORDER

This matter is before the Court on the motion for summary judgment (filing 24) filed by defendant Pharma Chemie, Inc. (PCI). The Court has considered the parties' briefs (26, 47, and 53) and indexes of evidence (25 and 48). For the reasons discussed below, the Court finds that PCI's motion should be granted and judgment entered accordingly.

## I. FACTUAL BACKGROUND

The following facts are those stated in the parties' briefs that are supported by the record, that the parties have admitted, or that the parties have not properly resisted. *See,* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1)(A) and (e)(2). Unless otherwise noted, the following facts are undisputed for purposes of the pending motion for summary judgment.[1]

---

[1] In response to PCI's motion for summary judgment, Reyes introduced several exhibits already found in PCI's index of evidence (see filings 48-1, 48-2, and 48-3). The only additional evidence Reyes has provided is a copy of the Nebraska Equal Opportunity Commission (NEOC) file relating to her charge of discrimination. Filing 48-4. PCI has moved to strike this exhibit on the grounds that it is unauthenticated and that much of it constitutes inadmissible hearsay. Filings 51 and 52. The Court will construe PCI's motion to strike as an objection under Fed. R. Civ. P. 56(c), which provides that a party may object that materials cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence at trial. *See also Foreword Magazine, Inc. v. OverDrive, Inc.,* 2011 WL 5169384 (W.D. Mich. 2011) (discussing 2010 amendments to Rule 56). In any event, the Court will deny PCI's motion as moot, because even after considering the facts available in Reyes' NEOC file, the Court finds that Reyes has failed to set forth a genuine issue of material fact on any of her claims.

PCI produced nutritional supplements, animal health products, and "flavor base systems" that other companies use to make their products more palatable. Filing 25-1 at ¶ 1. PCI's owner and president was Mark Pieloch. Filing 25-1 at ¶ 2. The company was small: as of January 2010, it had 40 employees, including Pieloch. Filing 48-4 at 40. By April 30, 2010, that number had dropped to 29. Filing 48-4 at 45.

Plaintiff Rocio Reyes began working for PCI as a temporary contract employee in March 2008. Filing 25-1 at ¶ 3. In July 2008, she was hired directly by PCI to a permanent part-time position as a product packaging technician. Filing 25-1 at ¶ 3. Reyes' immediate supervisor was Jeanette Rivera, who was supervised in turn by Brad Sears. Filing 25-2 at ¶ 1. Rivera and Reyes were friends before Reyes began working at PCI, and Rivera recommended that PCI hire Reyes. Filing 25-2 at ¶ 10.

Reyes often worked together with Monica Cortez. Filing 25-1 at ¶ 5. Both women were fluent in Spanish and would talk with one another in Spanish while working. Filing 25-1 at ¶ 5. Cortez and Reyes were also the only Hispanic employees of PCI. Filing 48-4 at 44–45. While Reyes' first language was Spanish, she spoke some English. Filing 25-1 at ¶ 4. Her level of fluency is disputed. PCI asserts that Reyes is "bilingual." Filing 25-1 at ¶ 4. Reyes stated she did not speak much English, and that is why she and Cortez almost always conversed in Spanish. Filing 48-4 at 19. When she was being interviewed for the position, Reyes was given a paper to read that was written in English, and had trouble reading it. Filing 48-4 at 19. However, Reyes also stated that she enjoyed talking to Rivera, who did not speak Spanish, and that she did so often. Filing 48-4 at 19; filing 25-2 at ¶ 4. Reyes' coworkers in the packaging department did not speak Spanish, nor did any of the packaging supervisors. Filing 25-2 at ¶ 4; filing 25-1 at ¶ 10.

According to Pieloch and Rivera, Reyes and Cortez's use of Spanish was problematic, because PCI's packaging operations required clear communication among employees and supervisors. Filing 25-1 at ¶ 10; filing 25-2 at ¶ 4. Reyes' job description stated that she was responsible for reading batch records and performing work as assigned by her supervisor, attaching appropriate labels to products and packing them into the correct cases, tracking production schedules, notifying her supervisor of mechanical or material issues, placing the finished goods on the designated pallet, attaching appropriate shipping documentation to the pallet, signing batch records, and calculating yield figures. Filing 25-1 at 11–12. The position also required the ability to read, write, and communicate in English, and to read and understand batch records and written instructions. Filing 25-1 at 13. Accuracy was important, because PCI shipped its customers fully-finished

products that had to be correctly bottled and labeled for use or resale. Filing 25-1 at ¶ 1.

## A.   The February 2010 Meeting

In early 2010, Rivera expressed concerns to Pieloch and Sears about Reyes and Cortez "constantly speaking Spanish during work activities." Filing 25-2 at ¶ 2; filing 25-1 at 5. Rivera averred that when a supervisor would give Reyes and Cortez directions in English, they would not respond to the supervisor, but would commence speaking to one another in Spanish. Filing 25-2 at ¶ 2; filing 25-1 at ¶ 5. This left the supervisors uncertain if their directions had been understood. Filing 25-2 at ¶ 2; filing 25-1 at ¶ 5.

On February 11, 2010, Pieloch met with Reyes and Cortez to discuss their use of Spanish in the workplace. Filing 25-1 at ¶ 11. Precisely what Pieloch said at this meeting is disputed. Pieloch averred that he told Reyes and Cortez that they needed to speak English while working, in order to prevent packaging mistakes and facilitate relations with coworkers and supervisors. Filing 25-1 at ¶ 11. According to Pieloch, Reyes and Cortez said they could speak Spanish whenever they wanted, and if he did not like it, he could fire them, but they would not quit their jobs and they would continue to speak Spanish while working. Filing 25-1 at ¶ 11. Pieloch stated that he told them he would not fire them, but that he would seek the assistance of an attorney. Filing 25-1 at ¶ 12. According to Reyes, Pieloch told her and Cortez that he could fire them for speaking Spanish. Filing 48-4 at 3. Reyes also stated that Pieloch said the reason they could not speak Spanish was because their conversations bothered the other workers, who thought Reyes and Cortez were talking about them. Filing 48-4 at 3, 19.

## B.   Reyes' Performance Evaluation

On February 17, 2010, Rivera completed a performance evaluation of Reyes, as part of a broader review of PCI's packaging technicians. Filing 25-1 at ¶ 17, pp. 134–35; filing 25-2 at ¶ 7. Reyes had been on a leave of absence from May to December 2009. Filing 25-2 at ¶ 7. Work operations had changed during that time, and Reyes had some difficulty adapting. Filing 25-2 at ¶ 7. In the evaluation, Rivera noted under "Interpersonal Relationships" that Reyes "had a rough start with some of the people and it has led her to become quiet and that is leading to her productivity being low." Filing 25-1 at 135. Reyes, along with two other non-Hispanic employees received "below average" performance evaluations. Filing 25-2 at ¶ 7; filing 25-1 at 134–35. On a scale of 1 to 5, this was a 2, with 1 being "unsatisfactory" and 5 being "excellent." Filing 25-1 at 134–35. Following the evaluations, Rivera spent extra time with all three employees, observing them and trying to help them improve their performance. Filing 25-1 at ¶ 17; filing 25-2 at ¶ 7. Rivera also made herself available to help Reyes. Filing 25-2 at ¶¶ 8–9.

**C.      The Language Policy**

On March 4, 2010, PCI adopted a policy entitled "Language While Performing Work". Filing 25-1 at ¶ 6, p. 14. The policy provided, in full:

> Pharma Chemie requires all employees to speak English while performing work to promote efficiency, safety, and monitoring of the workplace by supervisors and others who speak English.
>
>   Employees are required to speak English while performing work when other employees are present. Exceptions are made for situations where speaking a language other than English does not affect efficiency, safety, or the monitoring of work by supervisors:
>
> - If two or more employees are working in an area and all of the employees have a good ability to communicate in a language other than English, and no other employees are in the area, the employees may communicate in the non-English language that they all understand.
> - If a customer, vendor, or other person not employed by Pharma Chemie addresses an employee using a language other than English or otherwise indicates a preference for communicating in that language, the employee can respond in that language, if capable of doing so, provided such does not affect efficiency, safety, or the monitoring of work by supervisors.
> - The use of words or phrases from languages other than English that are commonly known to English speakers (!Hola!, Salut, Guten Tag) or other uses of words from languages other than English that do not interfere with work communications is not prohibited.
>
> Employees are not required to speak English when not performing work. For instance, the requirement does not apply during work breaks, lunch breaks, personal calls, or any other personal time or activity.
>
> Violations of the language policy may result in disciplinary action, up to and including termination. Inadvertent or isolated violations of the language policy may be addressed by a reminder. Intentional and repeated violations will be considered insubordination.

Filing 25-1 at ¶ 8, p. 41. The policy applied to all PCI employees. Filing 25-1 at ¶ 8. Reyes signed a form acknowledging she had received notice of the new policy on March 25, 2010. Filing 25-1 at ¶ 6, p. 14. She also wrote on the signature page that she did not agree with the new policy. Filing 25-1 at 14.

Pieloch averred that the language policy was "justified by business necessity." Filing 25-1 at ¶ 9. Pieloch and Rivera explained that in early 2010, employees in the packaging line were making too many mistakes. Filing 25-1 at ¶ 9; filing 25-2 at ¶ 3. For example, products were being shipped without caps and employees were retrieving the wrong lids and labels for products. Filing 25-1 at ¶ 9; filing 25-2 at ¶ 3. According to Pieloch, the policy was principally adopted in response to these mistakes, but also in order to improve efficiency, quality, safety,[2] and the ability of supervisors to monitor employees. Filing 25-1 at ¶ 9. PCI management determined that "communications on the packaging line needed to be in a language all employees and their supervisors understood in order to eliminate the packaging errors that had been occurring." Filing 25-1 at ¶ 10; filing 25-2 at ¶ 4.[3]

After the policy was adopted, Reyes and Cortez continued to speak Spanish during work. Filing 25-1 at ¶ 12. PCI did not discipline them, and Reyes made no further complaints to PCI about the language policy. Filing 25-1 at ¶ 12.

**D.    Reyes and Cortez's Charges of Discrimination**

On April 6, 2010, Cortez filed a charge of discrimination with the NEOC and Equal Employment Opportunity Commission (EEOC). *See* filing 1 at ¶ 21; filing 11 at ¶ 16; filing 28-1 at 86. Reyes filed a similar charge on April 16, 2010. Filing 25-1 at 88. PCI received notice of Cortez's charge some time on or shortly after April 16.[4] In her NEOC charge, Reyes alleged that

---

[2] In its response to Reyes' NEOC charge, however, PCI admitted that safety was "not the primary motivation" for the policy, but noted that safety issues could arise if employees were "especially confused." Filing 48-4 at 8 n.2.

[3] Reyes alleges that packaging technicians were "not required to communicate with each other in any way to perform their essential job functions," but cites no evidence in support of this claim. Filing 47 at ¶ 7.

[4] Upon receiving a formal charge of discrimination, Nebraska law requires the NEOC to furnish the employer with a copy within 10 days. Neb. Rev. Stat. § 48-1118(1). When PCI actually received notice of Cortez's charge is not clear, but the timing is relevant to Reyes' retaliation claim. The Court will assume, for purposes of the pending motion, that PCI received notice of Cortez's charge some time before April 22, 2010. This inference is supported by the fact that the 10-day statutory

after the February meeting Rivera treated her differently by watching her, not helping her, and accusing her of not listening. Filing 25-1 at 88. Cortez made similar complaints in her NEOC charge. Filing 28-1 at 86.

Reyes also alleged that after the policy was adopted, she was scheduled to work apart from Cortez to prevent them from speaking Spanish. Filing 25-1 at 88. However, Reyes has retracted this allegation in her brief opposing PCI's motion for summary judgment. *See* filing 26 at 12–15; filing 47 at 12–15. PCI conducted a review of its work schedules and security videos, and determined that Reyes and Cortez worked in the same area essentially the same number of days before and after the February 11, 2010 meeting.[5] Filing 25-1 at ¶¶ 14–15, pp. 89–133; filing 25-3 at ¶¶ 1–3.

**E.    Reyes' Termination**

On April 22, 2010, Reyes was terminated as part of a reduction in force, along with two other non-Hispanic employees. Filing 25-1 at ¶¶ 21–22. On April 20, PCI had adopted guidelines to govern the reduction in force. Filing 25-1 at ¶ 21, p. 136. Under the guidelines, full-time employees were to be retained over part-time employees. Filing 25-1 at ¶ 21, p. 136. The only other factor to be considered was "efficiency," measured by employees' most recent performance evaluations. Filing 25-1 at ¶ 21, p. 136. In the separation notice given to Reyes, PCI stated that it would be willing to rehire her in the future. Filing 25-1 at 137.

On April 22, 2010, Cortez put in her notice of intent to resign. Filing 28-1 at ¶¶ 18–19, p. 138. Her employment ended on April 29. Filing 28-1 at ¶ 18. Her separation notice stated that her performance was satisfactory, and she was eligible for rehire. Filing 28-1 at 139. PCI maintains that Cortez's decision to resign was entirely voluntary and that she would otherwise have remained an employee. Filing 28-1 at ¶ 19.

## II. STANDARD OF REVIEW

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(2). The movant bears the initial

---

notice requirement was observed in Reyes' case. *See* filing 48-4 at 3, 35 (Reyes' NEOC charge filed April 16, notice sent to PCI on April 26). Also, Cortez's charge is what prompted PCI to conduct its investigation into Cortez and Reyes' work assignments, which was completed by April 23. *See* filing 25-3 at 1–3; 28-3 at 1–3.

[5] Reyes argued that her purported separation from Cortez was unlawful discrimination. Because Reyes has agreed there is no factual support for this claim, the Court considers it waived.

responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). The Court must rely upon evidence that will be admissible at trial to determine the presence or absence of a material issue of fact. *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307 (8th Cir. 1993).

### III. ANALYSIS

Reyes brings claims for discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48–1101 *et seq*. Reyes first argues that PCI's language policy violated each of the above statutes. Reyes also claims that PCI retaliated against her for filing a charge with the EEOC and opposing PCI's language policy. The Court will consider each claim in turn.

### A.   The Language Policy

Reyes argues broadly that PCI's language policy violated Title VII, § 1981, and NFEPA. At various points in these proceedings, Reyes has

advanced theories of disparate treatment, disparate impact, and hostile work environment. *See*, filing 1 at ¶ 27; filing 12 at 2; filing 47 at 6–8. For the sake of completeness, the Court addresses each theory.

The Court begins with the framework governing Reyes' Title VII claims, because nearly identical standards apply to her claims under § 1981 and NFEPA.

Sections 703(a)(1) and (2) of Title VII provide:

(a) It shall be an unlawful employment practice for an employer--

> **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

PCI has noted one important difference between Title VII and § 1981. Whereas Title VII prohibits discrimination on the basis of race and national origin, § 1981 only applies to cases of intentional racial discrimination, and does not support claims based solely on the plaintiff's national origin. *Torgerson, 643 F.3d at 1052–53*. PCI argues Reyes' claims "focus on her Hispanic descent and the language those of her national origin routinely speak," and so are based solely on her national origin. Filing 26 at 10.

The Court need not decide whether Reyes' claims are based "solely" on national origin. The line dividing the concepts of "race" and "national origin" is fuzzy at best, and in some contexts, national origin discrimination is so closely related to racial discrimination as to be indistinguishable. *Short v. Mando American Corp., 805 F. Supp. 2d 1246, 1267 (M.D. Ala. 2011)*. But Reyes fails to set forth an issue of fact on her Title VII claims, whether premised on her race or national origin. Her § 1981 claims, which are governed by identical standards, must also fall.

Even under Title VII, language itself is not a protected class. Nor are language and national origin interchangeable. *See*, *Mumid v. Abraham*

*Lincoln High School*, 618 F.3d 789, 795 (8th Cir. 2010); *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009). Title VII does, however, prohibit the use of language as a covert basis for national origin discrimination, and "[d]ifferences in language and other cultural attributes may not be used as a fulcrum for discrimination." *Gloor*, 618 F.2d at 270.

The Court recognizes that language is closely tied to national origin and that English-only policies may cause employees to feel devalued, humiliated, and may even, in some cases, give rise to a hostile work environment. *See, e.g., EEOC v. Premier Operator Servs.*, 113 F. Supp. 2d 1066 (N.D. Tex. 2000). The Supreme Court has observed:

> Just as shared language can serve to foster community, language differences can be a source of division. Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility.

*Hernandez v. New York*, 500 U.S. 352, 371 (1991). But in the present case, Reyes has failed to present evidence that PCI's policy was motivated by or resulted in race or national origin discrimination. In fact, the record before the Court is nearly silent when it comes to what, if any, effect the policy had on Reyes. Whether Reyes brings her claim under the theory of disparate treatment, disparate impact, or hostile work environment, the result is the same. Reyes has not presented sufficient evidence for a reasonable jury to find that PCI's policy violated Title VII, § 1981, or NFEPA.

**1.    Disparate Treatment**

A claim of disparate treatment targets the most easily understood type of discrimination: an employer treats some workers less favorably than others because of their membership in a protected class. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15 (1977). The Court begins with the elements of Reyes' claim under Title VII, because the same framework applies to her claims under § 1981 and NFEPA.

Absent direct evidence of discriminatory intent, disparate treatment claims are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012); *see also Torgerson*, 643 F.3d at 1043–46. Under this framework, Reyes must first establish a prima facie case of discrimination. *Onyiah*, 684 F.3d at 716. To do so, she must show: (1) that she is a member of a protected class; (2) that she was qualified for her position and performed

her duties adequately; and (3) that she suffered an adverse employment action, (4) under circumstances that would permit the court to infer that unlawful discrimination was involved. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). Reyes may establish an inference of discriminatory intent by showing that she was treated differently than similarly situated persons who are not members of her protected class. *Bennett v. Nucor Corp.*, 656 F.3d 802, 819 (8th Cir. 2011).

If an employee establishes a prima facie case, the burden (of production) shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged actions. *Barber*, 656 F.3d at 792. If the employer does so, the burden shifts back to the employee to produce evidence sufficient to create a genuine issue of fact that the employer's explanation is merely a pretext for unlawful discrimination. *Id.* The burden-shifting analysis is only a framework for deciding summary judgment motions: at all times Reyes retains the burden of proving that a prohibited reason, rather than the proffered reason, actually motivated PCI's actions. *Id.*; *Oniyah*, 684 F.3d at 716.

The elements of Reyes' § 1981 claim are identical. *Bennett*, 656 F.3d at 818. And NFEPA is patterned, in part, after Title VII, *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 691 (Neb. 1999), so the Court will apply the same standards to Reyes' NFEPA claim. *Al-Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1030, 1039–40 (8th Cir. 2005) (failure of claims under Title VII dooms similar claims under NFEPA).

Reyes' disparate treatment claim fails for the simple reason that Reyes (and Cortez) were treated the same as everyone else at PCI. The language policy applied to all employees. Filing 25-1 at ¶ 8. Nor has Reyes alleged that the policy was selectively enforced—in fact, the policy was not enforced at all. Reyes and Cortez continued to speak Spanish, in violation of the policy, but PCI did not discipline them or take any action in response. Filing 25-1 at ¶ 12. It is true that "similarly situated persons" are not present in every case of discrimination. *Tran v. Standard Motor Products, Inc.*, 10 F. Supp. 2d 1199, 1206 & n.11 (D. Kan. 1998). Reyes could still establish a prima facie case of discrimination by showing, in any manner, that she suffered an adverse employment action under circumstances permitting an inference of discriminatory motivation. *Sallis*, 408 F.3d at 476.

But because the policy was never enforced, there was no associated adverse employment action. An adverse employment action means a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *Id.* Mere inconvenience, without an accompanying decrease in title, salary, or benefits is insufficient to show an adverse employment action, *id.*; and "not everything that makes an employee unhappy is an

actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). The only adverse employment action Reyes has alleged is her termination.[6] Filing 47 at 9. But Reyes was not fired for violating the language policy. Reyes was fired as part of the reduction in force, due to her performance evaluations and part-time status. Filing 25-1 at ¶¶ 21–22, p. 136. Reyes has produced no evidence tying her termination to the policy.

Even if Reyes had made a prima facie case, PCI has offered a legitimate, nondiscriminatory reason for her termination. Reyes was terminated, along with two other non-Hispanic employees, as part of a reduction in force, due to her part-time status and performance deficiencies. Filing 25-1 at ¶¶ 21–22. Nor has Reyes shown that PCI's reduction in force was a pretext, and that PCI actually fired her for violating the policy, or on account of her race or national origin, or in retaliation for opposing the policy or filing her NEOC charge. *See* part IV.B, *infra*.

Reyes argues that the reduction in force was a pretext, because she "never received an unsatisfactory mark" in her performance evaluation. Filing 47 at 9. But "unsatisfactory" was the lowest possible score on PCI's rating scale, which went: excellent, above average, satisfactory, decreased performance, and unsatisfactory. Filing 25-1 at 134. Reyes did receive several marks for "decreased performance," and nothing above "satisfactory" in any field. Filing 25-1 at 134–35. Her overall performance was "below average," and Rivera noted that Reyes needed to "only worry about herself" and needed to try harder. Filing 25-1 at 135. Reyes has failed to put forth a prima facie case of disparate treatment, and even if she had, she has not shown that PCI's reduction in force was a pretext for discrimination.

## 2.   Disparate Impact

Title VII also prohibits employment practices or policies that, while facially neutral and nondiscriminatory in their treatment of protected groups, in operation fall more harshly on one group than another and cannot be justified by business necessity. *Int'l Bhd. of Teamsters*, 431 U.S. at 335–36

---

[6] In her charge to the NEOC, Reyes claimed that following the February 2010 meeting, Rivera subjected her to extra supervision, refused to help her, and accused her of not listening. Filing 25-1 at 88. Reyes appears to have abandoned this claim in her complaint and brief opposing summary judgment. Filing 1; filing 47. To the extent she would claim Rivera's alleged mistreatment was discriminatory, the claim would fall flat. *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–14 (2002) (criticism of an employee is not an adverse employment action.) Nor would such conduct create a hostile work environment. *See, e.g.*, *O'Brien v. Dep't of Ag.*, 532 F.3d 805, 810 (8th Cir. 2008) (manager's increased scrutiny insufficient).

n.15. When proceeding under a disparate impact theory, proof of discriminatory motive or intent is not required. *Id.*

Title VII sets forth a burden-shifting framework for disparate impact claims that differs from that of *McDonnell Douglas*. First, the plaintiff must demonstrate that the employer used a particular employment practice that caused a disparate impact on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(k)(1)(A)(i). Stated another way, to establish a prima facie case, the plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two. *Bennett*, 656 F.3d at 817.

If the plaintiff sets forth this prima facie case, the burden (not only of production, but of persuasion as well) shifts to the employer to demonstrate that the challenged practice was "job related for the position in question and consistent with business necessity." § 2000e-2(k)(1)(A)(i); *see also Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005). If the employer meets this burden, the plaintiff can still prevail by showing that there was a less discriminatory alternative. § 2000e-2(k)(1)(A)(ii) and (C); *E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 742 (8th Cir. 2006).

The Court will apply the same analysis to Reyes' claim under NFEPA, because neither party has suggested a different analysis is warranted. *See*, *Father Flanagan's Boys' Home*, 590 N.W.2d at 691; *Al-Zubaidy*, 406 F.3d at 1039–40. Reyes cannot, however, bring a disparate impact claim under § 1981, as it only prohibits *intentional* discrimination. *Bennett*, 656 F.3d at 817.

Reyes' disparate impact claim fails because she has not shown what, if any, impact the language policy actually had on her and Cortez. She and Cortez, the only Hispanic employees of PCI, were also the only employees that the policy *could* have impacted in any significant manner. No other PCI employees spoke Spanish. Filing 25-2 at ¶ 4; filing 25-1 at ¶ 10. But potential impact is not enough. "In disparate-impact litigation the question is not whether a given test or standard is lawful standing alone, but whether its application has been adequately justified." *Lewis v. City of Chicago*, Ill., 643 F.3d 201, 205 (7th Cir. 2011). Because PCI's language policy was not enforced, Reyes has failed to identify any "impact" at all.

And, as with her disparate treatment claim, Reyes has failed to identify any adverse employment action connected to the policy. *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (plaintiff must show adverse employment action under both disparate treatment and disparate impact theories); *West v. Norton*, 376 F. Supp. 2d 1105, 1121 (D.N.M. 2004) (same); *cf. New York City Transit Authority v. Beazer*, 440 U.S. 568, 584 (1979) (plaintiff must show that the employment practice at issue had "the effect of denying the members of one race equal access to employment opportunities"); *Evers v.*

*Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001) (same required for disparate impact claims under ADEA). Reyes has failed to make out a prima facie case, so the Court need not determine whether PCI's language policy was consistent with business necessity. *See* § 2000e-2(k)(1)(B)(ii).

**3.   Hostile Work Environment**

Title VII is not limited to addressing tangible or economic discrimination. *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 683 (8th Cir. 2012). The statute also applies to the "'terms, conditions, or privileges of employment,'" and prohibits discriminatorily hostile or abusive work environments. *Id.* To state a claim, the workplace must be "'permeated with discriminatory intimidation'" that is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. *Id.*

The environment must be both objectively hostile, as perceived by a reasonable person, and subjectively abusive as actually viewed by the plaintiff. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010). To assess the objective component, the Court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *Id.* at 518–19. The standard is a demanding one, designed to filter out complaints concerning the ordinary tribulations of the workplace. *Id.* at 519. The same standard governs Reyes' claims under § 1981 and NFEPA. *Anderson*, 606 F.3d at 518 (§ 1981); *Al-Zubaidy*, 406 F.3d at 1039–40 (NFEPA).

Again, Reyes' claim fails because she has not identified how the policy affected her at all, let alone shown that it contributed to a hostile environment. She has not offered an affidavit or evidence detailing how the policy made her feel. Reyes may have found the policy upsetting. But the Court cannot simply assume that the PCI workplace was "'permeated with discriminatory intimidation.'" *CRST Van Expedited, Inc.*, 679 F.3d at 683. In her rebuttal interview with the NEOC, Reyes stated that she was treated poorly by PCI and that she "became ill because of the treatment." But these statements lack the specificity needed to create an issue of fact. The interview occurred on February 7, 2011, nearly a year after Reyes was terminated. Filing 48-4 at 19. Reyes does not indicate the extent of her illness, when she became sick, or whether the illness was prompted by the policy itself, or by the loss of her job. Even construing the record in the light most favorable to Reyes, and drawing all inferences in her favor, these statements are too lacking in factual content to create an issue of fact on the existence of a hostile work environment.

4.     **The EEOC Guidelines**

In addition to the statutory and common-law frameworks governing Reyes' claims, the EEOC has set forth guidelines governing "speak-English-only" rules. *See* 29 C.F.R. § 1606.7. The Court has postponed consideration of the guidelines because it is not clear what, if any, effect they should have in this case. The guidelines distinguish between policies requiring employees to speak English at all times or "only at certain times." § 1606.7. The EEOC considers the former to be a "burdensome term and condition of employment" because a person's primary language "is often an essential national origin characteristic." § 1606.7(a). The guidelines continue:

> Prohibiting employees at all times, in the workplace, from speaking their primary language or the language they speak most comfortably, disadvantages an individual's employment opportunities on the basis of national origin. It may also create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment. Therefore, the Commission will presume that such a rule violates [T]itle VII and will closely scrutinize it.

*Id.*

Policies applied only at certain times are permitted, but only where the employer can show the rule is "justified by business necessity." § 1606.7(b). Thus, under the guidelines, "an employee meets the prima facie case in a disparate impact cause of action merely by proving the existence of the English-only policy." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993); *see also Pacheco*, 593 F. Supp. 2d at 621. This advances the inquiry to the next stage of the burden-shifting framework, so that the employer must come forward with evidence of business necessity. Taken at face value, then, the guidelines could have a significant effect on this case, especially given Reyes' failure to otherwise make a prima facie case.

But courts are split on how to treat these guidelines. The Ninth Circuit has rejected these guidelines as contrary to the text of Title VII. *Spun Steak*, 998 F.2d at 1489–90. A few district courts have accepted and applied the guidelines. *See, e.g.*, *Premier Operator Servs.*, 113 F. Supp. 2d at 1073; *EEOC v. Synchro-Start Prods., Inc.*, 29 F. Supp. 2d 911 (N.D. Ill. 1999). The Tenth Circuit has taken a nuanced middle approach. *Maldonado v. City of Altus*, 433 F.3d 1294, 1305 (10th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The Eighth Circuit has yet to speak on the subject. This Court sees merit in the holdings of both *Spun Steak Co.* and *Maldonado*.

- 14 -

As a general matter, EEOC guidelines do not have the force of law, but are entitled to great deference. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975). The guidelines constitute "'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Courts should defer to an EEOC guideline unless there are "compelling indications that it is wrong." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 94 (1973).

The *Spun Steak* court refused to defer to these guidelines, finding that they contradict the text of Title VII. Title VII explicitly sets forth the burden-shifting framework for disparate impact cases. 42 U.S.C. § 2000e-2(k)(1)(A)(i). The guidelines contradict the text of the statute by shifting the burden of showing business necessity to the employer before the plaintiff has actually come forward with evidence of disparate impact. *Spun Steak*, 998 F.2d at 1489–90. In creating Title VII, Congress intended to strike a balance between preventing discrimination and preserving the independence of employers, and these guidelines upset that balance. *Id.* at 1490.

By contrast, in *Maldonado*, the Tenth Circuit avoided deciding what "legal" effect to give the guidelines. Instead, the court held that the guidelines may function, at the summary judgment stage, "not as interpretations of the governing law, but as an indication of what a reasonable, informed person may think about the impact of an English-only work rule on minority employees, even if [the Court] might not draw the same inference." *Maldonado*, 433 F.3d at 1306. *Maldonado* addressed the impact of an English-only policy in the context of a hostile work environment claim. The policy itself, and not just its effects, may create or contribute to a hostile work environment:

> Here, the very fact that the [defendant] would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility to Hispanics. At least that could be a reasonable inference if there was no apparent legitimate purpose for the restrictions. It would be unreasonable to take offense at a requirement that all pilots flying into an airport speak English in communications with the tower or between planes; but hostility would be a reasonable inference to draw from a requirement that an employee calling home during a work break speak only in English. The less the apparent justification for mandating English, the more reasonable it is to infer hostility toward employees whose ethnic group or nationality favors another language.

*Id.* at 1305 (emphasis supplied).

This approach does not shift the burden to the employer to show that the policy is actually consistent with business necessity. Instead, it examines the apparent purpose for the policy. In other words, the court looks to the context in which the policy was enacted. There is nothing revolutionary about this: in a hostile work environment claim, context is key. *Oncale v. Sundowner Offshore Services*, Inc., 523 U.S. 75, 81–82 (1998).

*Maldonado* does not stand for the proposition, however, that an English-only policy *alone* will necessarily create an issue of fact on a hostile work environment claim. In *Maldonado*, there was other evidence of hostility, including ethnic taunting caused by the policy and a statement by the defendant city's mayor referring to the Spanish language as "garbage." *Maldonado*, 433 F.3d at 1301, 1304. And the employees stated that the policy made them feel like second-class citizens. *Id.* at 1304.

This Court agrees with the Ninth Circuit's conclusion that the guidelines contravene the text of Title VII and are not owed deference as an interpretation of the statute. But the Court also agrees with the position of the Tenth Circuit, and finds that the language policy itself, and the circumstances of its adoption, are relevant in assessing whether Reyes has created an issue of fact on her discrimination claim. To summarize: plaintiffs challenging an English-only policy under Title VII will not necessarily be able to make out a prima facie case (under any theory) based solely on the presence of an English-only policy. But the policy itself, and the apparent purposes behind its adoption, are factors that may be considered. There may be cases where the policy at issue is so egregiously overbroad that nothing more will be needed to defeat a motion for summary judgment.

But that is not the case here, and the above considerations do not change the outcome under any of the theories advanced by Reyes. First, PCI's policy was far narrower than that at issue in *Maldonado*. There, the plaintiffs presented evidence that the policy applied even during breaks, lunch times, and to private telephone conversations. *Maldonado*, 433 F.3d at 1300, 1305. There was no apparent, legitimate reason for such a broad policy, so an inference of hostility was reasonable. *Id.* at 1305. PCI's policy, by contrast, did not apply during breaks, and did not apply if all employees present in the area had "a good ability to communicate" in the other language. Filing 25-1 at ¶ 8, p. 41.

PCI has also offered several reasons for the policy: to decrease mistakes being made on the packaging line and to allow supervisors to monitor employees' performance. Filing 25-1 at ¶¶ 9–10; filing 25-2 at ¶¶ 3–4. Reyes has offered no facts contradicting these apparent justifications. The Court finds that these justifications are reasonable and legitimate. PCI has a

legitimate business interest in increasing the accuracy and efficiency of its packaging operations. And employers may require employees to speak English in managers' presence so that managers can evaluate their job performance. *See, e.g.*, *Pacheco*, 593 F. Supp. 2d at 622; *EEOC v. Sephora USA, LLC*, 419 F. Supp. 2d 408, 415, 417 (S.D.N.Y. 2005).

The proffered justifications are legitimate in and of themselves—but PCI has been conspicuously silent on the specifics behind its policy. Pieloch and Rivera simply averred that "it was determined" that packaging operations needed to be in English to correct errors that had been occurring. Filing 25-1 at ¶¶ 9–10; filing 25-2 at ¶¶ 3–4. They did not indicate that Reyes and Cortez were ever the cause of any errors. Reyes' performance evaluation did not mention anything of the sort. Filing 25-1 at 134–35. And it is undisputed that Reyes and Cortez were able to speak some English, and apparently enough to do their jobs.[7] So, it is not clear how their casual conversations had the ability to disrupt packaging operations. And since they could speak some English, supervisors could have monitored their performance simply by asking them to speak in English when they were being supervised. PCI has not demonstrated that it needed such a broad policy to achieve these goals.

Instead, the real reason for the policy may be the one proffered by Reyes: her and Cortez's conversations bothered the other workers, who did not speak Spanish and thought Reyes and Cortez were talking about them. Filing 48-4 at 3, 19; *see also* filing 25-1 at ¶ 11. But even if this was the true reason for the policy, and even if the other reasons were mere pretext, Reyes' claim fares no better. Courts have upheld English-only policies enacted to improve employee relations and protect workers from feeling they are being talked about by others. *See, e.g.*, *Roman v. Cornell University*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999); *Tran*, 10 F. Supp. 2d at 1210. PCI's policy was reasonably tailored to achieve this goal.[8] Nor is the connection between this

---

[7] When Reyes was interviewed for the position, she was given a paper to read that was written in English. Filing 48-4 at 19. Although she had trouble reading it, she was still hired. Filing 48-4 at 19.

[8] The Court expresses no opinion as to whether PCI's justifications or the proof in support of them would meet the more demanding standard of business necessity in a disparate impact case. *See e.g.*, *El v. Southeastern Pennsylvania Transp. Authority (SEPTA)*, 479 F.3d 232, 242 (3d Cir. 2007) (noting that the test is "'business *necessity*'" and not "'business convenience'") (emphasis supplied); *Dial Corp.*, 469 F.3d at 742 (policy or requirement should be related to the safe and efficient performance of the job at issue).

goal and the policy so attenuated that an inference of hostility or discriminatory intent is warranted.

While the policy may have demonstrated a lack of sensitivity on PCI's part, this is not the same as prohibited discrimination. Reyes has not put forward any evidence that the policy affected her in any manner actionable under Title VII, § 1981, or NFEPA. Nor is there any evidence that Reyes' coworkers were hostile or even rude to her. Reyes has failed to demonstrate that the policy was the product of intentional discrimination, or caused an atmosphere of hostility, or even that it caused an adverse employment action or otherwise actionable disparate impact. Accordingly, the Court finds that PCI is entitled to summary judgment on this claim.

**B.   Reyes' Claim of Retaliation**

Reyes claims that PCI terminated her in retaliation for opposing the language policy and filing a charge of discrimination with the NEOC, in violation of Title VII, § 1981, and NFEPA. As a preliminary matter, PCI argues that Reyes has failed to exhaust her administrative remedies. The Court agrees, but only as to Title VII.

Title VII requires that before a plaintiff file a lawsuit alleging discrimination, she must file a timely charge with the EEOC or a state or local agency with authority to seek relief. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012); 42 U.S.C. § 2000e–5(e)(1). If the agency dismisses the charge and notifies the complainant of her right to sue, then she has 90 days to bring a civil action in federal court. *Richter*, 686 F.3d at 850–51; § 2000e–5(f)(1). Each incident of discriminatory treatment constitutes a separate "unlawful employment practice" for which the administrative remedies must be exhausted. *Richter*, 686 F.3d at 851. A complainant need not file a new charge for claims that are "like or reasonably related to" claims that she has properly exhausted. *Id.* But this exception is narrowly construed. *Id.* at 852; *Wedow v. City of Kansas City, Missouri*, 442 F.3d 661, 672–73 (8th Cir. 2006).

In her April 16, 2010, charge to the NEOC, Reyes alleged discrimination on the basis of national origin (but not race) and stated that the discrimination took place on February 11, 2010, at the earliest, and on March 17, 2010, at the latest. Filing 48-4 at 3. She left unchecked the box for "retaliation." Filing 48-4 at 3. Her charge also makes no mention of her termination, since she was not terminated until April 22. Filing 48-4 at 3; filing 25-1 at ¶¶ 21–22. Reyes did not file a new charge of discrimination based upon her termination.

Some courts hold that when an employee claims he or she was retaliated against for filing a charge with the EEOC, the retaliation claim is "reasonably related to" the underlying charge and is exempted from the

- 18 -

exhaustion process. *See, e.g.*, *Franceschi v. U.S. Dept. of Veterans Affairs*, 514 F.3d 81, 86–87 (1st Cir. 2008); *Williams v. New York City Housing Authority*, 458 F.3d 67, 70 n.1 (2d Cir. 2006). But in *Richter*, the Eighth Circuit rejected this view. 686 F.3d at 851–54; *but see* id. at 859 (Bye, J., concurring in part and dissenting in part) (arguing that requiring additional exhaustion of such retaliation claims creates a "'needless procedural barrier'" that will discourage plaintiffs from filing new retaliation charges for fear of additional reprisal by employer) (quoting *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)). The Court finds that Reyes failed to properly exhaust her claim of retaliation under Title VII.

Section 1981, on the other hand, does not require exhaustion. *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1103–04 (9th Cir. 2008); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007). NFEPA does require plaintiffs to exhaust their claims with the NEOC, but plaintiffs may bring suit under Neb. Rev. Stat. § 20-148, which provides an independent cause of action for violations of NFEPA and does not require exhaustion. *Goolsby v. Anderson*, 549 N.W.2d 153 (Neb. 1996). Although Reyes did not mention § 20-148 in her complaint, that is no stumbling block: there is no need to specifically plead § 20-148. *See* *Trimble v. BNSF Ry. Co.*, 2008 WL 2795863 at *3 (D. Neb. 2008).

Nevertheless, Reyes' retaliation claims under § 1981 and NFEPA fail on their merits. Both are governed by the same standard as a claim for retaliation under Title VII. *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 684 (8th Cir. 2012) (§ 1981); *Gacek v. Owens & Minor Distribution, Inc.*, 666 F.3d 1142, 1146 (8th Cir. 2012) (§ 1981); *Al-Zubaidy*, 406 F.3d at 1040 (NFEPA). To establish a prima facie case of retaliation, Reyes must show that (1) she engaged in a statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection exists between the two events. *Gacek*, 666 F.3d at 1146. The same burden-shifting framework that governed Reyes' disparate treatment claim applies here. *Id.*; *Oniyah*, 684 F.3d at 716. If Reyes makes a prima facie case, the burden will shift to PCI to articulate a legitimate, nondiscriminatory reason for its actions. *Gacek*, 666 F.3d at 1146. If it does so, the burden shifts back to Reyes to show that the proffered reason was merely a pretext for discrimination. *Id.*

Reyes has established the first two elements of her prima facie case. Her termination qualifies as an adverse employment action. She opposed PCI's language policy and filed an NEOC charge—both protected activities. *See* 42 U.S.C. § 2000e-3(a). It does not matter that PCI's policy has not been declared unlawful. The anti-retaliation provision of Title VII (and thus § 1981 and NFEPA) is interpreted broadly to cover opposition to employment actions that are not unlawful, so long as the employee acted in a good faith,

objectively reasonable belief that the practices were unlawful. *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977–78 (8th Cir. 2012). The Court has no reason to doubt Reyes' good faith on this matter.[9]

But Reyes has not shown that there was any causal connection between her opposition to the language policy or filing a NEOC charge and PCI's decision to terminate her. The only evidence tending to support a causal connection is the timing of events. Sometimes a plaintiff may establish the required causal connection merely by showing temporal proximity between engaging in a protected activity and the alleged retaliation. *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1079 (8th Cir. 2005). But timing alone is usually not enough, *id.*; unless the timing between the protected act and retaliation was "very close." *Marez v. Saint-Gobain Containers, Inc.*, --- F.3d ----, 2012 WL 3079223 at *3 (8th Cir. 2012).

Reyes noted her opposition to the new policy on March 25, 2010, when she acknowledged receipt of the policy. Filing 48-4 at 22. Her refusal to comply with the policy also indicated her opposition, and this apparently continued up until the day she was terminated.[10] Cortez filed a charge of discrimination on April 6, which PCI learned of some time on or shortly after April 16. Filing 1 at ¶ 21; filing 11 at ¶ 16; filing 28-1 at 86; *see also* note 4, *supra*. Reyes filed her charge with the NEOC on April 16. Filing 25-1 at 88. On April 20, PCI formulated the policies governing its reduction in force. Filing 25-1 at ¶ 21, p. 136. On April 22, Reyes and two non-Hispanic employees were terminated as part of the reduction in force. Filing 25-1 at ¶¶ 21–22. Cortez put in her notice of intent to resign on the same day, but it is not clear whether this happened before or after the decision to terminate Reyes was announced. Filing 28-1 at ¶¶ 18–19, p. 138. Cortez's employment did not end until April 29. Filing 28-1 at ¶ 18.

There is no evidence that PCI learned of Reyes' NEOC charge prior to April 26, 2010. Filing 48-4 at 35. So, if the timing of these events is to support

_____

[9] The EEOC guidelines also gave Reyes a good-faith basis for believing the policy may have been unlawful, given that the Eighth Circuit has yet to decide their validity.

[10] The parties have not briefed the issue, but the Court will assume, for purposes of this motion, that this qualified as protected opposition. *See Smith v. Wynfield Development Co., Inc.*, 451 F. Supp. 2d 1327, 1350 (N.D. Ga. 2006) (noting that EEOC compliance manual includes as protected conduct the refusal to obey an order because of a reasonable belief that it is discriminatory); *cf. Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1194 (8th Cir. 2001) (manager may have engaged in protected conduct if she refused to implement discriminatory policy).

a finding of causation, PCI must have retaliated against Reyes for her March 26 note of opposition, her continuing refusal to comply, or for *Cortez's* charge of discrimination, which PCI learned of at some point between April 16 and April 22. Assuming, for the sake of argument, that the timing between these events and her termination establishes a prima facie case, Reyes has not offered any evidence to show that PCI's reduction in force was pretextual. While timing alone may suffice to establish a prima facie case, without more, it is generally insufficient to show pretext and retaliatory motive. *Hilt v. St. Jude Medical S.C., Inc.*, 687 F.3d 375, 379 (8th Cir. 2012). With no other evidence tying her termination to her (or Cortez's) protected activities, Reyes has failed to set forth an issue of fact on her retaliation claim.

## IV. CONCLUSION

The Court finds that PCI is entitled to summary judgment. Reyes has failed to present evidence from which a reasonable jury could find that she was discriminated against on the basis of race or national origin, or that she was retaliated against for engaging in protected activities. Accordingly,

IT IS ORDERED that:

1.   Defendant PCI's motion for summary judgment (filing 24) is granted;

2.   PCI's motion to strike (filing 51) is denied as moot; and

3.   A separate judgment will be entered.

Dated this 11th day of September, 2012.

BY THE COURT:

John M. Gerrard
United States District Judge